# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

National Railroad Passenger Corp.,    )
                        )
              Plaintiff,    )
                        )
               v.             )      Civil Action No.  04-1457 (ESH)
                        )
Lexington Insurance Co., *et al.*    )
                        )
           Defendants.    )
_____)

## MEMORANDUM OPINION

This is the second case in which National Railroad Passenger Corporation ("Amtrak")

seeks excess insurance coverage from several of its "excess liability" insurers.  *See National R.R.*

*Passenger Corp. v. Lexington Ins.*, 365 F.3d 1104 (D.C. Cir. 2004).  Defendants claim that

plaintiff's suit is barred by statute of limitations or by laches and have moved to dismiss the

complaint for failure to state a claim upon which relief can be granted.  For the reasons stated

below, the Court concludes that defendants' motion must be denied.

## BACKGROUND

In September 1999, Amtrak was held liable for $25 million in a personal injury suit

brought by Kimberly Acorn, a passenger in a car that collided with an Amtrak train at a public

railroad crossing.  Amtrak paid this amount and seeks reimbursement from defendants, who

insured Amtrak for personal injury liability in excess of $10 million.  Amtrak was insured under

two sets of policies, the first covering the policy period October 1, 1996 through September 30,

1997 (the "1996-97 policies") and the second covering the period October 1, 1997 through

September 30, 1998 (the "1997-98 policies").  In a prior related action, Amtrak unsuccessfully

sought reimbursement from the insurers subscribing to the 1997-98 policies (the "1997-98

insurers").  *See id.*, *aff'g Nat'l R.R. Passenger Corp. v. Lexington Ins. Co.*, Mem. Op., Civ. No.

01-1815 (D.D.C. May 20, 2003) ("Mem. Op.") (granting summary judgment to defendants).  The

Court of Appeals held that "Amtrak may not recover under the 1997-98 polic[ies]" but

"express[ed] no view on whether Amtrak is entitled to reimbursement under the 1996-97

polic[ies]."  *Id.* at 1105.  Amtrak has now brought suit claiming that the 1996-97 insurers have

breached their obligations.  The 1997-98 insurers in the prior action and defendants in this action

are largely the same, as is the policies' relevant policy language.  (*See* Def.'s Statement of P. &

A. Supporting Their Mot. to Dismiss (hereinafter "Mot.") at 5, 28 n.12.)[1]

On September 27, 1999, the day of the Alcorn verdict, Amtrak sent notice to Amtrak's

insurers through a broker indicating that Amtrak was covered under the 1996-97 policies.  (*See*

Mem. Op. at 5).  Shortly thereafter, on October 15, 1999, Amtrak's broker sent notice to the

97-98 insurers suggesting instead that Amtrak was covered under the 1997-98 policies.  (Decl. of

Frederick J. Wilmer in Supp. of Defs.' Mot. for Partial Summ. J. (filed in prior action) Ex. 6.)

(Amtrak indicated in the prior action that the first notice letter was in error.)  (*See* Mem. Op. at 5

n.5.)  Over the next several years, while post-trial motions and an appeal by Amtrak were

pending, the insurers' counsel "purported to reserve its clients' rights and to investigate potential

coverage issues."  (Compl. ¶ 18.)

---

[1]Lexington, St. Paul, and Unionamerica were named as defendants in this action and the
prior action.  The Lloyds 1996-97 insurers are nearly the same as the 1997-98 Lloyds "first
excess layer" insurers named in the prior action, except that one additional syndicate participates
in the 1996-97 policies.  (*Id*. at 5.)

In a letter dated April 6, 2001, the insurers' counsel set out three "coverage positions" based on their investigation.  Coverage Position 2 stated that Amtrak had failed to timely notify the insurers in accordance with either set of policies, negating its coverage under both.  (Ballaine Decl. Ex. A, Letter from Frederick J. Wilmer to William G. Ballaine, Apr. 6, 2001 (hereinafter "April 6 letter"), at 3.)  The letter also maintained that the parties' rights and obligations were dictated by the 1996-97 policies, rather than the 1997-98 policies, because "Amtrak's claim agent was aware of the Alcorn accident within days after it occurred [on August 27, 1997]."  (*Id.*)

Through a series of subsequent letters in May and June, Amtrak's counsel asked that the insurers retract the positions laid out in the April 6 letter.  (*See* Ballaine Decl. Ex. A.)  In a May 4, 2001 letter, Amtrak informed the insurers' counsel that, in response to the April 6 letter, it had "reluctantly conclude[d] that Excess Insurers have been acting in bad faith with respect to this Claim."  (Ballaine Decl. Ex. A, Letter from Ballaine to Wilmer, May 4, 2001 (hereinafter "May 4 letter"), at 2.)  Amtrak warned that the insurers' failure to discharge their "good faith contractual obligations to Amtrak under the 1998 policies [was] likely to have serious consequences," and that Amtrak would pursue "all available judicial redress."  (*Id.* at 11.)  After two more requests for retraction on June 1 and June 28, the insurers responded on July 6 to withdraw their third coverage position but "decline[d] Amtrak's request to withdraw their [other two] coverage positions."  (Ballaine Decl. Ex. A, Letter from Wilmer to Ballaine, July 6, 2001, at 1.)

On August 9, 2001, Amtrak's counsel informed the insurers that Amtrak would soon be obligated to pay the Alcorn judgment, and asked the insurers' counsel to "*immediately* advise us if and to what extent your insurer clients wish to participate in the payment process . . . ."  (Ballaine Decl. Ex. A, Letter from Ballaine to insurers' counsel, Aug. 9, 2001, at 1) (emphasis in

original).  The insurers' counsel responded on the same day, stating that "at this stage and in light of their prior coverage positions, our clients do not intend to participate in what you refer to as the 'payment process.'"  (Ballaine Decl. A, Letter from Wilmer to Ballaine, Aug. 9, 2001.)  On August 27, 2001, Amtrak filed a complaint for coverage under the 1997-98 policies.  The next day, Amtrak paid $16.1 million in partial satisfaction of the Alcorn judgment.  This payment satisfied the policies' Condition 6, which requires a payment in excess of $10 million by Amtrak before the insurers' contractual obligations are triggered.[2/]  (*See* Opp'n at 5.)  On August 30, 2001, Amtrak demanded indemnity from the 1997-98 insurers.  (*See* Ballaine Decl. Ex. A, Letter from Dale Stein, Amtrak Treasurer to 1997-98 Insurers, Aug. 30, 2001.)

This Court granted summary judgment to the 1997-98 insurers in the prior action on the grounds that the Alcorn claim was not properly allocated to the 1997-98 policies.  (Mem. Op. at 1-2.)  The Court of Appeals affirmed this decision on March 7, 2004.  Thereafter, Amtrak demanded indemnification from the 1996-97 insurers on August 13, 2004, and filed this lawsuit on August 26, 2004.  (Compl. ¶ 26.)  In Count I, plaintiff seeks a declaratory judgment that defendants cannot deny their obligations based on any "coverage ground."  (Compl. ¶¶ 28-31.)  In Count II, plaintiff seeks compensatory damages for breach of contract.  (Compl. ¶¶ 32-33.)

---

[2/]Condition 6 is the same in both the 1996-97 and 1997-98 policies.  It reads:

6.    <u>Attachment of Liability</u>
Liability to pay under this Policy shall not attach unless and until the Insured has, with Underwriters' prior written consent, paid an amount of Ultimate Net Loss which exceeds the [$10 million] Accident retention set out in Item 2 of the Declarations and any remaining underlying amount set out in Item 3 of the Declarations.

(Pl.'s St. of P. & A. Opposing Defs.' Mot. to Dismiss (hereinafter "Opp'n") at 5 (emphasis removed).)

## ANALYSIS

### I.    Legal Standard

Defendants move to dismiss the complaint under Fed. R. Civ. P. 12(b)(6) for failure to

state a claim upon which relief may be granted.  A defendant may raise the affirmative defense of

a statute of limitations via a Rule 12(b)(6) motion when the facts giving rise to the defense are

apparent on the face of the complaint.  *Blackmon-Malloy v. U.S. Capitol Police Bd.*, 338 F. Supp.

2d 97, 101 (D.D.C. 2004).  The allegations in plaintiff's complaint are presumed true and all

reasonable factual inferences should be construed in plaintiff's favor.  *Maljack Prods., Inc. v.*

*Motion Picture Ass'n of Am., Inc.*, 52 F.3d 373, 375 (D.C. Cir. 1995); *Phillips v. Bureau of*

*Prisons*, 591 F.2d 966, 968 (D.C. Cir. 1979).  Defendants submit, and plaintiff does not contest,

that the Court may also consider documents in the record from Amtrak's prior action without

converting the motion to dismiss into a motion for summary judgment by taking judicial notice

of these records.[3/]  (Mot. at 13.)  If "no reasonable person could disagree on the date" on which

the cause of action accrued, the court may dismiss the claim on statute of limitations grounds.

*U.S. ex rel. Purcell v. MWI Corp.*, 254 F. Supp. 2d 69, 73 (D.D.C. 2003).

### II.    Statute of Limitations

Defendants claim that this action is barred by the District of Columbia's three-year statute

of limitations for contract claims.  Because plaintiff's contract claim did not accrue until

defendants' performance on the contract was due, which was at the earliest less than three years

prior to its commencement of this suit, the statute of limitations does not bar plaintiff's claims.

---

[3/]The facts relied upon in this Memorandum Opinion are drawn either from the Complaint
or from documents filed in the prior action. (*See* Ballaine Decl. ¶ 5 (identifying documents filed
in the prior action).)

### A.    Applicable Law

Where a cause of action in federal court is based on state law, as where a court sits in diversity, the court must apply the law of the forum state.  *See Van Gemert v. Boeing Co.*, 553 F.2d 812, 813 (2d Cir. 1977) ("It is the source of the right, not the basis of federal jurisdiction, which determines the controlling law.")  *See also  Erie v. Tompkins*, 304 U.S. 64, 78 (1938); *Guaranty Trust Co. v. York*, 326 U.S. 99, 112 (1945); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  Defendants assert that although the accident and suit which are the basis for Amtrak's indemnity claim occurred in Missouri, D.C.'s three-year statute of limitations for contract actions not covered by the Uniform Commercial Code, rather than Missouri's five-or-ten-year statute of limitations, applies to this action.  (Mot. at 14-17).  Although the two states' laws conflict, D.C.'s choice of law rules require that the Court apply this jurisdiction's procedural laws, including its three-year statute of limitations for contract claims.  *See Nat'l R.R. Passenger Corp. v. Notter*, 677 F. Supp. 1, 4 (D.D.C. 1987) (three-year statute of limitations applied to contract case brought in diversity because District of Columbia courts would hold that the statute of limitations issue is procedural and therefore governed by forum law); *A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1458 (D.C. Cir. 1995) (D.C. treats statute of limitations as procedural and almost always applies its own rule).  Plaintiff does not appear to dispute this interpretation.  Thus, under D.C.'s statute of limitations for contract actions, the issue for the Court is whether plaintiff brought this suit more than three years after "the time the right to maintain the action accrue[d]"  D.C. Code § 12-301(7).

### B.    When did plaintiff's right to maintain this action accrue?

General principles of contract law dictate that a plaintiff's right of action normally

accrues "when the contract is first breached." *Capitol Place I Assocs. L.P. v. George Hyman Constr. Co.*, 673 A.2d 194, 198 (D.C. 1996). *See Franconia Assocs. v. U.S.*, 536 U.S. 129, 144 (2002). A party is not in breach of a contract until its performance is due, and performance is not due until the other party has fulfilled all conditions precedent to that performance. *See Ramey v. Dist. 141, Int'l Ass'n of Machinists & Aerospace Workers*, 378 F.3d 269, 279 (2d Cir. 2004) ("the cause of action does not accrue[] until the date of the actual breach; that is, until the date on which performance is due"); *Bldg. Servs. Co. v. Nat'l R.R. Passenger Corp.*, 305 F. Supp. 2d 85, 94 (D.D.C. 2004) ("A contractual provision for possible compensation does not render its denial an automatic breach."). Condition 6 of both sets of policies clearly provides that the insurers are not obligated to indemnify Amtrak unless and until Amtrak makes a payment in excess of $10 million. (*See supra* note 2.) Thus, the statute of limitations could not have begun to run any earlier than August 28, 2001, when Amtrak made the first payment of $16.1 million. (*See* Opp'n at 19.) As this date is less than three years before plaintiff filed this suit on August 26, 2001, the statute of limitations does not bar this suit.

Defendants attempt to defeat this well-established principle. First, they point to several cases which have held that the statute of limitations in an insurance action runs from the time the insured receives notice of the insurer's denial of coverage. (*See* Mot. at 24-26.) For instance, in *Partnership Placements, Inc. v. Landmark Insurance Co.*, 722 A.2d 837 (D.C. 1998), a property development corporation brought an action against its liability insurer for breaching its duty to defend certain property owners in liability suits. The trial court's ruling that "the three-year statute of limitations on a claim for breach of an insurance contract begins to run when the insured receives notice of rejection of a claim under the policy" was "undisputed" before the

District of Columbia Court of Appeals. *Id.* at 841. *See also Dillard v. Travelers Ins. Co.*, 298 A.2d 222, 224 (D.C. 1972) (statute of limitations in action to recover double indemnity accidental death benefits ran from date insurer refused claim). Similarly, in *Finegan v. Lumbermens Mutual Casualty Co.*, 329 F.2d 231 (D.C. Cir. 1963), the statute of limitations in an action for negligence in writing and issuing an insurance policy began to run either when the insured received the policy or when the insured learned that the insurer had denied coverage under the policy. *Id.* at 233.

    None of these cases puts into question the general principle that the statute of limitations in a contract case runs from the time the contract was *breached* and that a breach normally only occurs when performance is due. *See, e.g., Dillard*, 298 A.2d at 224 ("As a general rule, the statute of limitations begins to run from the date a contract is breached."). *Finegan*'s holding applied only to a negligence claim, and there was no indication in either *Partnership* or *Dillard* that the insurer's performance was not yet due at the time coverage was purportedly denied, as is the case here. Thus, these cases fail to advance defendants' argument that the limitations period for Amtrak's suit expired three years after the insurers' purported denial of coverage on either April 6, 2001 or July 6, 2001. *See Thurston v. United States*, 696 F. Supp. 680, 681 (D.D.C. 1988) (where State Department denied annuities to former wife of U.S. Foreign Service member, statute of limitations for contract claim did not begin to run until former husband died; prior to that time, although aware of the State Department's position, former wife was confronted only with "anticipated but conjectural breach of contract").

    Defendants' second argument frames the April 6 letter (or at the latest the July 6 letter) as an anticipatory repudiation and relies on the principle that "a declaration of intent by a promisor

not to perform the contract can become a breach if the promisee elects to treat it as such."

Williston On Contracts, § 63:51 (4th ed.).   A "repudiation" can start the statute of limitations

clock running only if the repudiating party "communicated . . . unequivocally and positively its

intent not to perform," *Keefe Co. v. Americable Int'l, Inc.* 755 A.2d 469, 475 (D.C. 2000), and

the promisee chooses to treat the repudiation as a present breach.   *Franconia Assocs.*, 536 U.S. at

144.   Defendants thus argue that the statute of limitations began running when Amtrak received

notice of the insurers' "coverage positions" because (1) the insurers unequivocally

communicated their intent not to indemnify Amtrak under the 1996-97 policies, and (2) Amtrak

treated that communication as a breach of contract.   Amtrak contests both of these premises.

First, Amtrak argues that the insurers' counsel's April 6 and subsequent letters cannot be

construed as unequivocally denying coverage under the 1996-97 policies.   The April 6 letter

contained the following passage (Coverage Position 2):

> Irrespective of our clients' position regarding allocation [*i.e.*, whether the 96-97
> policies or the 97-98 policies applied], the information we discovered during our
> coverage investigation shows that Amtrak failed to timely notify our clients in
> accordance with the policies' notice conditions of coverage (the wording is
> essentially the same in all relevant policies). . . . *It is therefore our clients'
> position that they are not obligated to provide coverage to Amtrak* in excess of its
> self insured retention as a result of its late notice and failure to take reasonable
> action to resolve this matter at or below the level of plaintiff's settlement
> demands.

(April 6 letter at 3 (emphasis added).)   According to Amtrak, however, the insurers never

"explicitly and unambiguously disclaim[ed] outright any indemnity coverage under the 1996-

1997 policies.   Instead, from April 6, 2001 forward, they repeatedly reserved all their rights and

all of Amtrak's obligations under the Policies."   (Opp'n at 20.)   (*See, e.g.*, April 6 letter at 6 ("our

clients continue to reserve all the rights available to them under the policy").)   Moreover, the

- 9 -

April 6 letter invited "a response from Amtrak to the issues raised in this letter," "wecolme[d]

any comments," and agreed to "review any additional materials you believe our clients should

receive in light of the coverage positions."  (April 6 letter at 6.)  According to Amtrak,

subsequent letters declining to withdraw the April 6 coverage positions were "responding to

Amtrak's specific demand for acknowledgment of coverage under the *1997-1998* policies"[4] and

thus could not be construed as a repudiation of obligations under the 1996-97 policies.  (Opp'n at

20 (emphasis in original).)[5]

    These communications by the insurers' counsel persuade the Court that its alleged

repudiation was not unequivocal.  While the April 6 letter clearly puts forth the insurers'

"coverage position" that they were not obligated under the 1996-97 policies, this position appears

to have been open for discussion pending Amtrak's actual request for indemnification.  And, as

plaintiff correctly argues (*id.*), the subsequent letters were part of a discussion about the 1997-98

(not the 1996-97) policies.  Thus, defendants cannot claim that plaintiff's cause of action accrued

at the time of the April 6 letter.

    The Court need not rely on this conclusion, however, because even if the insurers

unequivocally communicated an intent not to perform under the 1996-97 policies, the facts do

not show that Amtrak treated this communication as a breach.  Where an "injured party [does not

_____

    [4]*See, e.g.*, May 4 letter (stating that Amtrak had concluded that the insurers had been
acting in bad faith in breach of their obligations under the 1997-98 policies and asking the
insurers to provide full coverage under the 1997-98 policies).

    [5]Amtrak also suggests that the insurers' April 6 position that they were not obligated
under the 1996-97 policies due to lack of timely notice was not definitive because if Amtrak had
given up its claim under the 1997-98 policies, the insurers might have changed their position
with respect to the 1996-97 policies.

treat a repudiation as a present breach and] instead opts to await performance, the cause of action accrues, and the statute of limitations commences to run, from the time fixed for performance rather than from the earlier date of repudiation." *Franconia Assocs.*, 536 U.S. at 144.

Defendants argue that Amtrak's communications with the insurers subsequent to the April 6 letter demonstrate that Amtrak did treat Coverage Position 2 as a present breach of contract. They point to Amtrak's letter of May 4, 2001, in which Amtrak stated that the insurers' coverage positions were in "bad faith" and had no reasonable grounds (May 4 letter at 2), and plaintiff's letter of June 28, 2001, which threatened suit based on "breach of their contractual obligations" unless the insurers withdrew "all of their baseless positions promptly." (Ballaine Decl. Ex. A, Letter from Ballaine to Wilmer, June 28, 2001, at 2.) Defendants also argue that Amtrak's filing of the prior lawsuit on August 27, 2001, one day before its initial payment of the Alcorn judgment, shows that Amtrak was treating the insurers' position as a breach.

From plaintiff's perspective, Amtrak's post-April 6 communications and lawsuit were solely related to the 1997-98 policies and thus cannot be construed as treating the insurers as being in breach of the 1996-97 policies. For instance, Amtrak's May 4 letter stated, "the 1997 policies are irrelevant to this claim" and asked the insurers to "agree to provide the full coverage to which Amtrak is entitled under the 1998 policies."[6] (May 4 letter at 7 n.10, and at 12.)

---

[6] Under the heading, "Amtrak Satisfied the Notice Requirement," the May 4 letter states, "The Excess Insurers' *1998 policies* easily could have provided in straightforward language that immediate notice of a claim was required whenever Amtrak received a written demand for at least $2.5 million, regardless of Amtrak's reasonable assessment of the value of the claim" and notes in a footnote, "As Excess Insurers know, $2.5 million is the claim value threshold for providing notice of claim under the Excess Insurers' *1998 policies*. As discussed in text, *the 1997 policies are irrelevant to this claim*." (May 4 letter at 7 (emphasis added).) Furthermore, in the "Summary" section of the letter, Amtrak's counsel wrote, "any failure of Excess Insurers to faithfully, fully and timely discharge all of their very substantial good faith contractual

- 11 -

Furthermore, Amtrak claims it "took pains to continue cooperating with the Insurers and to comply with Condition 6 before demanding that any of the Insurers satisfy their indemnity obligations under any of the Policies" rather than asserting that the insurers' communications absolved Amtrak of further duties under the contract.  (Opp'n at 23.)  Finally, while the April 6 letter may have been written on behalf of both the 1997-98 and 1996-97 insurers, plaintiff's challenge to insurers' denial of coverage in the prior action was directed only towards the 1997-98 insurers and the 1997-98 policies.

   Construing all reasonable factual inferences in favor of plaintiff, the Court concludes that Amtrak did not treat the April 6 letter as a breach of the insurers' obligations under the 1996-97 policies.  Although Amtrak objected to and asked the insurers to retract Coverage Position 2 -- which stated that coverage was "negated" under the 1996-97 policies as well as the 1997-98 policies -- there is no indication in Amtrak's communications that it perceived the discussion arising from the April 6 letter as relating to the 1996-97 policies.  On the contrary, Amtrak's letters specifically referenced the later policies and even noted that the earlier policies were "irrelevant" to their claim.  (May 4 letter at 7 n.10.)  Furthermore, there cannot be any dispute that in the prior action Amtrak sought indemnity under the 1997-98 policies only.  (*See* Wilmer Decl. Ex. 1 (Amended Complaint filed in prior action); Mem. Op. at 3 ("Amtrak does not seek coverage under the 1996-97 policies, but only under the 1997-98 policies.").)

   As Amtrak did not treat the repudiation, if any, as a breach of the 1996-97 policies, the Court concludes that Amtrak's present cause of action could not have accrued (and the statute of

_____

obligations to Amtrak *under the 1998 policies* is likely to have serious consequences.  Such a failure will likely force Amtrak to pursue all available judicial redress for the Excess Insurers' wrongdoing . . . ."  (*Id.* at 11 (emphasis added).))

limitations could not have begun to run) until the insurers' performance came due on August 28, 2001, less than three years prior to the date this suit was filed.  Therefore, defendants' statute of limitations defense must fail.

**III.    Laches**

Laches is an equitable doctrine, designed to serve the maxim that "equity aids the vigilant, not those who slumber on their rights."  *Independent Bankers Ass'n v. Heimann*, 627 F.2d 486, 488 (D.C. Cir. 1980).  By preventing the enforcement of stale claims, the doctrine obligates litigants to pursue their rights expeditiously.  *See NAACP v. NAACP Legal Def. & Educ. Fund, Inc.*, 753 F.2d 131, 137 (D.C. Cir. 1985); *Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 843 (D.C. Cir. 1982).  This Circuit has identified two preconditions for any laches defense: "a claim will not be barred under that doctrine unless it is shown that the party raising the defense was prejudiced by the other party's delay in raising the claim and that the delay was unreasonable."  *Burka v. Aetna Life Ins. Co.*, 56 F.3d 1509, 1514 (D.C. Cir. 1995). Therefore, in deciding whether to apply the doctrine here, the Court must consider (1) whether plaintiff inexcusably or unreasonably delayed filing this suit; and (2) whether the insurers were prejudiced because of that delay.  *See Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 318 (D.C. Cir. 1987); *Minkoff v. Clark Transfer, Inc.*, 841 F. Supp. 424, 429 (D.D.C. 1993).

Because the insurers cannot meet their burden of demonstrating either element, plaintiff's claims are not barred by laches.  As to the first prong, defendants argue that plaintiff unreasonably delayed by choosing not to join the 1996-97 insurers in the prior action.  As a result of the April 6 and July 6 letters, plaintiff knew of the likelihood that defendants would deny coverage under the 1996-97 policies at the time it brought its first suit.  Furthermore, the

language concerning notice was nearly identical under either set of policies and the underlying

facts were the same.  But as plaintiff's correctly points out, there is no "principle that bars

Amtrak from proceeding against the 1996-1997 insurers after it had unsuccessfully pursued a

claim against the 1997-1998 insurers . . . ."[7/]  (Opp'n at 31.)  Furthermore, at the time of the prior

action, Amtrak had a "firm conviction" that the insurers were obligated to indemnify it under the

1997-98 policies, and had not requested indemnity under the 1996-97 policies.  (*Id.*)  Thus, it was

not unreasonable for Amtrak to wait until the disposition of the prior action before bringing this

action.

  Nor does it appear that the insurers were prejudiced as a result of Amtrak's delay.  The

case law makes clear that the party asserting a laches defense must have relied on the plaintiff's

inaction and must have been harmed on account of that reliance.  *See NAACP*, 753 F.2d at 138-

39 & n.75 (holding that "mere passage of time does not bar injunctive relief," but that prejudice

could result from "the loss of the investment in labor and capital in reliance upon the plaintiff's

inaction"); *Mahan v. Tash*, 703 F. Supp. 130, 132 (D.D.C. 1989) (laches applicable where "by

reason of his delay the adverse party has good reason to believe that the alleged rights are

worthless, or have been abandoned" (quoting *Am. Univ. Park Citizen's Ass'n v. Burka*, 400 A.2d

737, 742 (D.C. 1979)).  The insurers are unable to satisfy this test.

  Defendants claim that they are prejudiced because, to the extent that they "wish to obtain

additional discovery on the notice issue . . . [,] it seems likely that memories will have faded,

witnesses may no longer be readily available, and relevant evidence may have been lost."  (Mot.

---

[7/]As defendants themselves note, neither claim nor issue preclusion would prevent
Amtrak from relitigating the issue of late notice because there was no final decision on the issue.
(Mot. at 30.)

at 30.)  Despite the undisputed fact that they already conducted discovery as to the notice issue in

the prior action, defendants maintain that a new strategy is necessary because late notice was a

"secondary issue" in the prior action, whereas it is now the "central issue."  (Defs.' Reply St. of

P. & A. (hereinafter "Reply") at 20.)  As such, defendants argue they would be "compelled to

seek additional discovery, including from third parties, or retaining experts to opine on matters

relating to the notice issue, all at tremendous additional expense."  (Mot. at 30.)  These

allegations of prejudice are simply not enough to support defendants' laches defense, especially

where the Court has concluded that plaintiff filed suit within the three-year statute of

limitations.[8]  That defendants now feel "compelled"  to pour money into hiring experts and

deposing additional witness is not a result of Amtrak's *delay* or any belief that Amtrak had

abandoned its claim against the 1996-97 insurers.  Rather, defendants' anticipate additional

expenses because Amtrak has now brought a *different* suit.  Thus, defendants cannot rely on the

defense of laches.

IV.    **Plaintiff's Waiver and Estoppel Argument**

Defendants argue that upon finding that the April 6 letter was not a breach that started the

statute of limitations running against plaintiff, the Court must bar plaintiff from relying on

---

[8]Defendants point to *Amidon v. Amidon*, 280 A.2d 82 (D.C. 1971), where the District of
Columbia Court of Appeals applied laches to a plaintiff's suit to recover alimony under a
separation agreement after seven years, though the statute of limitations was twelve years.
(Reply at 18.)  This case is distinguishable.  In *Amidon*, the Court found that laches applied
because the defendant "had good reason to believe that his former wife had abandoned her claim
for support and, acting in reliance upon such belief had paid out over those years between
$12,000 and $14,000 to send their son to private school which he could not have afforded had he
also been paying maintenance to her."  *Id.* at 84.  By contrast, the insurers in this case had no
reason to believe Amtrak had abandoned its claim under the 1996-97 policies and made no
additional investments in reliance on such a belief.

"conflicting theories" that presuppose a duty on the part of defendants prior to or as of that date.

(Mot. at 34-35; Reply at 22-24.)  Defendants are specifically concerned about Amtrak's assertion

that "[b]y reason of their conduct prior to April 6, 2001 the Insurer Defendants represented by

[Kissel & Pesce LLP] have waived or are estopped from asserting the coverage position on late

notice set forth in [Kissel & Pesce LLP's] April 6, 2001 letter"  (Compl. ¶ 20), and request that

the Court strike this paragraph along with the references to waiver and estoppel in paragraph 27

of the Complaint.  The arguable inconsistency in plaintiff's position need not be resolved at this

time, since it is not relevant to the Court's determination of whether plaintiff's action must be

dismissed for failure to state a claim.

## CONCLUSION

For the reasons stated above, the Court finds that plaintiff's claims are barred by neither

the statute of limitations nor laches and denies defendants' motion to dismiss.  A separate order

accompanies this Memorandum Opinion.


_____
            s/
ELLEN SEGAL HUVELLE
United States District Judge

DATE:  February 16, 2005